UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Huerta,<br><br>         Plaintiff,<br><br>    v.<br><br>AT&T Umbrella Benefit Plan No. 1,<br><br>         Defendant. | Case No.: 3:11-cv-01673-JCS<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND DENYING DEFENDANT'S MOTION TO STRIKE AS MOOT [Dkt. Nos. 44, 50, 57].** |

## I.   INTRODUCTION

Plaintiff Juan Huerta ("Plaintiff") brings this action for disability benefits under 29 U.S.C. § 1132, which provides for civil actions against employee benefit plans governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq*. At issue is the proper interpretation of the Pacific Telesis Group Comprehensive Disability Plan ("Disability Plan").  Plaintiff asserts the Claims Administrator violated the terms of the Disability Plan by failing to provide timely notice that it would recover an overpayment occasioned by Plaintiff's receipt of retroactive Social Security Disability Insurance benefits.  Therefore, Plaintiff argues, Defendant can no longer recover the overpayment by reducing his monthly long-term disability benefits.  The parties brought cross-motions for summary judgment, which are presently before the Court.  The motions came on for hearing September 21, 2012 at 9:30am.  The parties submitted supplemental briefing on October 5, 2012.  For the reasons stated below, Defendant's Motion for Summary Judgment is GRANTED and Plaintiff's Motion for Judgment is DENIED.[1]

---

[1] The parties have consented to the disposition of this case before the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

## II.     BACKGROUND[2]

### A.     Overview of the Disability Plan

Plaintiff receives monthly long-term disability ("LTD") benefit payments from the Pacific Telesis Group Comprehensive Disability Plan, a component of the larger AT&T Umbrella Benefit Plan No. 1. Joint Statement of Undisputed Material Facts ("UMF") Nos. 2, 4, Administrative Record ("AR") 1292, 1324. At all relevant times, AT&T, Inc. ("AT&T") has been the Plan Administrator, and as such, has the "authority and discretion to interpret the terms of the Plan, including the authority and discretion to resolve inconsistencies or ambiguities." UMF No. 7, AR 1315. Sedgwick Claims Management Services, Inc. ("Sedgwick") is the third-party Claims Administer for the Disability Plan, UMF No. 9, and has been delegated by AT&T "the power and discretion . . . to interpret and adopt reasonable constructions of any provision of the Plan." AR 1237.[3] The Sedgwick unit that administers claims for disability benefits under the Disability Plan is AT&T Integrated Disability Service Center ("IDSC"). UMF No. 10, AR 1829-47.

The Disability Plan unambiguously grants the Claim Administrator the power to reduce a participant's monthly LTD benefit payments by the amount of their SSDI payments. Section 5 of the Disability Plan governs LTD benefits. AR 1225-29. Section 5.2.1 states that "[i]t is the intent of the Plan that a Participant shall not receive duplicate benefits from the Plan and from sources paying Integrated Benefits." AR 1227. "Integrated Benefits" is defined within section 5.2.1(a) to include SSDI benefit payments. *Id*. Section 5.2.2 of the Disability Plan provides the "Rules to Offset Integrated Benefits," and subsection 5.2.2(b) states that "[i]f Long Term Disability

---

[2] Unless otherwise indicated, the Court relied on facts which are undisputed or which the Court found to be undisputed.

[3] Section 11.4 of the Disability Plan reads as follows: "The Long Term Disability Claim Review Administration *shall have the power and discretion* to resolve all factual issues presented in a request for review in a reasonable manner, and to interpret and adopt reasonable constructions of any provision of the Plan whenever interpretation or construction is needed to resolve any issue presented in a request for review. The Long Term Disability Claim Review Administrator *shall also have the power and discretion* to establish general interpretations, rules, and procedures to guide the Long Term Disability Claim Administrator when approving or denying similar claims under Section 10." AR 1237 (emphasis added).

Benefits and Integrated Benefits are payable at the same time and apply to the same period of disability, the Long Term Disability Benefits shall be reduced by the amount of Integrated Benefits." AR 1228. In other words, the Disability Plan enables the Claims Administrator to reduce a plan participant's monthly LTD benefit payment by the amount of their SSDI benefit payment.

In the situation where a plan participant does not receive timely SSDI benefit payments, but rather receives a lump sum retroactive SSDI award, the Disability Plan also unambiguously grants the Claims Administrator the power to apply an offset to recover the amount overpaid to the participant. Section 5.2.2(f) states that "any retroactive reward of Social Security benefits described under Section 5.2.1(a) and not paid to a Participating Company may, but shall not be required to, be deducted from future Long Term Disability Benefits." AR 1228-29. Section 5.2.2 further states that "[t]here is no time limit on when offsets available under this section can be applied[,]" and that "[f]ailure to apply an offset as soon as it is available shall not constitute a waiver of offset rights or otherwise prevent their later exercise." AR 1229.

The Disability Plan also grants the Claims Administrator the power to recover an overpayment by reducing a participant's monthly LTD benefit payments. Section 5.2.3 states that retroactive SSDI benefits "may be recovered by withholding any further Long Term Disability Benefits under the Plan until the amount overpaid or deemed to have been advanced has been recovered." AR 1229. When the Claims Administrator recovers an overpayment by reducing a participant's monthly LTD benefit payments, subsection 10.3.2(c) applies the following "condition":

> If a payment of a Long Term Disability Benefit is reduced or eliminated in order to permit the Plan to recover an overpayment or advance, then the Long Term Disability Claims Administrator *shall give written notification within ninety days after <u>declaring</u> the overpayment.*

UMF No. 17, AR 1236 (emphasis added). The main issue in this case is whether IDSC adhered to the notice condition in subsection 10.3.2(c).

3

### B.  Plaintiff's LTD Benefits

Plaintiff was a Communication Technician for Pacific Bell, but left work on December 27, 2004 due to cervical stenosis, myelopathy cervical, and cervical spine radiculopathy. UMF Nos. 1, 19, AR 409, 463, 449. Plaintiff's claim for short-term disability benefits was approved for the maximum duration of 52 weeks, from January 3, 2005 to January 1, 2006. UMF No. 20, AR 275-78. When Plaintiff applied for LTD benefit payments, IDSC informed Plaintiff that he was required to apply for SSDI benefits within ninety days of IDSC approving his application for LTD benefits. UMF No. 26, AR 475. IDSC informed Plaintiff that if he received any SSDI benefits, the amount of his monthly LTD benefit payments would be reduced by the amount of his SSDI benefits. UMF Nos. 24, 27, AR 475. Plaintiff was also informed that if he received a retroactive SSDI award, Plaintiff would be required to reimburse the Disability Plan for the amount he had been overpaid by the Disability Plan. UMF No. 27, AR 475.

Plaintiff also signed an Agreement Concerning Long Term Disability Income Benefits ("the LTD Agreement") before he began receiving LTD benefits. UMF No. 22, AR 1147. Under the LTD Agreement, Plaintiff agreed to notify the claims administrator immediately if he began receiving SSDI benefits. Plaintiff also agreed to repay the Disability Plan for any advance in full after the claims administrator determined the amount of the overpayment. UMF Nos. 29-35, AR 1140. Once Plaintiff was approved for LTD benefits commencing January 2, 2006, IDSC sent Plaintiff a letter reminding him of his obligations to notify IDSC if he received any SSDI benefits and repay any overpayment resulting from a retroactive award. UMF Nos. 38-41, AR 1053-54. To ensure that IDSC would be apprised of any SSDI award, Plaintiff authorized Allsup, Inc. ("Allsup"), a third-party vendor of IDSC's, to obtain Plaintiff's Social Security status and relay that information to IDSC. AR 525-26, 560, 814-19.

Although Plaintiff applied for SSDI benefits in February 2006, he did not receive any SSDI benefit payments until February 2009. At that time, in addition to receiving monthly SSDI benefit payments, Plaintiff received a retroactive SSDI award because it was determined that Plaintiff should have received SSDI benefit payments beginning June 1, 2005. UMF No. 47, AR 560. On February 9, 2009, IDSC learned about the SSDI benefits through Allsup, including the

retroactive award. AR 560. On February 11, 2009, one of IDSC's case managers, Mr. Brad Bingle, began to offset Plaintiff's monthly LTD benefit payments to account for his monthly SSDI benefit payments, but not to account for the retroactive award. UMF No. 48, 50 AR 560.

One week later, on February 17, 2009, Mr. Bingle calculated the amount of the overpayment occasioned by the retroactive SSDI award as totaling $63,288.11. UMF No. 49, AR 560. Mr. Bingle forwarded the spreadsheet with the calculations to his supervisor and set his diary to follow up in five business days.[4] AR 560. On March 2, 2009, Mr. Bingel's supervisor reviewed the calculation of the overpayment and confirmed it to be correct. UMF No. 511, AR 561. Mr. Bingle's supervisor noted that the "letter and spreadsheet have been returned to the [case manager]. The [overpayment] tracking screen has been completed." AR 561. At this point, according to IDSC's "Step Process," Mr. Bingle should have called Plaintiff and mailed him an "Overpayment Letter" within one business day.[5] *See* Pl. Opp., Ex. 1, DEF 3. However, Mr. Bingle did not notify Plaintiff of the overpayment through a letter or any other means.

On February 15, 2010, Plaintiff's case manager at IDSC changed to Ms. Debra Lawlor. UMF No. 59, AR 568. On March 29, 2010, Ms. Lawlor investigated and discovered the $63,288.11 overpayment, and that IDSC had only applied the monthly SSDI benefits to offset Plaintiff's LTD benefits, not the retroactive award. UMF No. 60, AR 571-72. Ms. Lawlor sent an email to Mr. Bingel's supervisor, reminding him of the Juris message he made confirming Mr. Bingel's calculation of the overpayment. AR 571. Ms. Lawlor wrote: "I cannot find the overpayment calculation letters, and cannot find Brad's spreadsheet. I need to know if we

---

[4] The exact notation in Juris, IDSC's internal note system, is as follows: "forwarded spreadsheet and letter to TL for review and set diary to f/u in 5 business days." AR 560. "TL" means "team leader."

[5] The AT&T Integrated Service Center Long Term Disability Step Process ("IDSC's Step Process") directs the case manager to calculate the overpayment within two business days of receiving the offset information, and draft a status letter and refer the letter and spreadsheet the supervisor within one more business day. Pl. Opp., Ex. 1, DEF 2. The supervisor then reviews the spreadsheet and letter within two business days, and returns it to the case manager for further handling. *Id.* The case manager is then supposed to call the participant and mail the Overpayment Letter within one more business day. *Id.* at DEF 3. These internal procedures suggest the participant is supposed to be notified of the overpayment within six days of IDSC receiving the information.

5

recovered the overpayment. Can you help?" AR 572. Mr. Bingel's supervisor responded: "You need to look in SIR to see if Brad ever sent out the overpayment spreadsheet and letter. It doesn't appear that any of the money was repaid. Here are the documents..." AR 572. That same day, Ms. Lawlor called Plaintiff and left a voicemail message advising him that IDSC would send a letter regarding an overpayment due to his retroactive SSDI benefits. UMF No. 61, AR 572. Ms. Lawlor sent the Overpayment Letter later that day, and Plaintiff received it on April 6, 2010. UMF No. 62, AR 714, 718-21. This was Plaintiff's first notice of the overpayment which IDSC had calculated over a year prior. UMF Nos. 62, 66 AR 572, 719-21.

      The Overpayment Letter informed Plaintiff that it would seek recovery of the $63,288.11 overpayment and gave Plaintiff three options to reimburse the Disability Plan. AR 720-21. One of the three options was to repay the amount in full by "March 18, 2009," even though the letter was dated "March 29, 2010." AR 719-20. The other two options would require Plaintiff to make $500 minimum monthly payments, or have IDSC reduce Plaintiff's monthly LTD benefits by $500 until the full amount was recovered. AR 720-21. The Overpayment Letter cited to the provisions in the Disability Plan which authorized IDSC to recover an overpayment occasioned by a retroactive SSDI award. UMF No. 62, AR 718-21. The Overpayment Letter did not mention IDSC's delay in notifying Plaintiff, however, or reference subsection 10.3.2(c), which states that if the Claims Administrator will recover an overpayment by reducing monthly LTD benefits, the Claims Administrator "shall give written notification within ninety days after declaring the overpayment." AR 1236. Finally, the Overpayment Letter stated: "If you disagree with the overpayment amount or that you have been overpaid LTD benefits by the Plan, you or your authorized representative may submit a written claim[,]" and provided IDSC's address. UMF Nos. 63-64, AR 721.

      In the year between the time Plaintiff received his retroactive SSDI award, and the time in which IDSC notified Plaintiff that it would seek to collect an overpayment of LTD benefits occasioned by the retroactive SSDI award, Plaintiff argues that he spent the retroactive SSDI award. On June 23, 2010, IDSC informed Plaintiff that it would start deducting $500 from his monthly LTD benefit payments in order to recover the $63,288.11 overpayment.

On June 28, 2010, Plaintiff's counsel wrote a letter to IDSC noting Plaintiff's intention to request a review of IDSC's decision after proper notice was made of his rights, requesting documents relevant to Plaintiff's claim for benefits, and disputing IDSC's right to recover the payment without providing notice to Plaintiff within ninety days of calculating the overpayment. UMF No. 77, AR 707-710.  In the letter, Plaintiff's counsel wrote: "Please note that this is not Mr. Huerta's request for review of the March 30, 2010 adverse benefit determination. Mr. Huerta will submit a request for review at a later date, after he has properly been noticed of his right to request review." AR 707. IDSC never responded to this letter. UMF No. 78.

**C.   The Complaint**

On April 6, 2011, Plaintiff filed his complaint in the Northern District of California. Dkt. 1. On January 2, 2012, Plaintiff filed his First Amended Complaint alleging three causes of action under ERISA: (1) a claim for benefits pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), to recover benefits due under the terms of the Disability Plan and to enforce and/or clarify his rights to future benefits; alternatively (2) a claim for equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to enjoin the Disability Plan from continuing to reduce Plaintiff's benefits; and (3) a claim for equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to enjoin the Disability Plan from failing to issue a notice of adverse benefit determination when it begins to reduce monthly LTD benefits to recover an overpayment. Dkt. 31. The parties have filed cross-motions for summary judgment. Dkts. 44, 50.

**D.   Plaintiff's Motion for Judgment**[6]

Plaintiff moves for summary judgment, or in the alternative, requests a bench trial pursuant to Federal Rule of Civil Procedure 52(a). Plaintiff's Motion at 9. Plaintiff asserts he is entitled to judgment because IDSC did not comply with the plain language of the Disability Plan and therefore, Defendant is now barred from recovering the $63,288.11 overpayment by reducing Plaintiff's LTD monthly disability payments by $500. *Id*. at 13-17. Specifically, Plaintiff accuses

---

[6] The Court summarizes Plaintiff's arguments from the following motion papers: 1) Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Opposition"); 2) Plaintiff's Motion and Notice of Motion for Judgment ("Plaintiff's Motion"); and 3) Plaintiff's Reply in Support of Plaintiff's Motion for Judgment as a Matter of Law ("Plaintiff's Reply").

7

1  IDSC of violating subsection 10.3.2(c) of the Disability Plan, which Plaintiff argues, requires the

2  Claims Administrator to provide written notice to a participant that it will recover an overpayment

3  within ninety days of calculating that overpayment. *Id*. at 14.  Plaintiff contends that subsection

4  10.3.2(c)'s notice requirement protects plan participants from unreasonable delay, and makes

5  sense in light of the overall purpose of disability benefits, which are intended to replace vitally

6  needed income. *Id*. at 16-17.  Plaintiff asserts he notified IDSC of his SSDI benefits by

7  authorizing Allsup to obtain his Social Security status and relay that information to IDSC, and

8  also argues that the LTD Agreement cannot override or modify the written terms of the Plan.

9  Plaintiff's Opposition at 19-21.  Plaintiff also brings equitable claims under ERISA § 502(a)(3),

10 29 U.S.C. § 1132(a)(3), to prevent Defendant from depriving him and other Disability Plan

11 participants the procedural protections mandated by ERISA, and to enjoin Defendant from

12 reducing Plaintiff's LTD benefits on equitable grounds. *Id*. at 17-21.  Plaintiff also opposes

13 Defendant's Motion on the grounds that there are disputed issues of material fact with respect to

14 the applicable standard of review, and Plaintiff's alternative claim for relief under 29 U.S.C. §

15 1132(a)(3).  Finally, Plaintiff contends the Court should apply a *de novo* standard of review on

16 Plaintiff's § 1132(a)(1)(B) claim because there is no unambiguous proof that discretionary

17 authority had been vested in Sedgwick, and in any event, Sedgwick failed to exercise that

18 discretion.

19      **E.**     **Defendant's Motion for Summary Judgment**[7]

20      Defendant asserts that it is entitled to summary judgment on Plaintiff's § 1132(a)(1)(B)

21 claim because no genuine issue of material fact exists that Defendant was entitled to recover the

22 $63,288.11 overpayment that resulted from Plaintiff's retroactive Social Security benefits and was

23 authorized by the terms of the Disability Plan to recover the overpayment by reducing Plaintiff's

24 monthly LTD benefits.  Defendant's Motion at 13-17.  Defendant argues that the terms of the

---

[7] The Court summarizes Defendant's arguments from the following motion papers: 1) Defendant AT&T Umbrella Benefit Plan No. 1's Motion for Summary Judgment ("Defendant's Motion"); 2) Defendant AT&T Umbrella Benefit Plan No. 1's Opposition to Plaintiff's Motion for Judgment ("Defendant's Opposition"); and 3) Defendant AT&T Umbrella Benefit No. 1's Reply in Support of Motion for Summary Judgment ("Defendant's Reply").

8

Disability Plan provide that there is no time-bar to applying an offset to recover an overpayment occasioned by retroactive SSDI benefits, and that IDSC complied with subsection 10.3.2(c)'s condition of notice because Defendant "declared" overpayment on March 29, 2010 when IDSC notified Plaintiff of the overpayment. Defendant's Reply at 7. Defendant also argues the LTD Agreement obliges Plaintiff to affirmatively disclose his retroactive award, and accuses Plaintiff of hiding his retroactive payment by failing to do so. Defendant's Motion at 14, 21-22. Defendant also requests the Court to grant its Motion on the basis that Plaintiff failed to exhaust his administrative remedies. Finally, Defendant asserts the Court should apply the abuse of discretion standard because discretionary authority to interpret the terms in the Disability Plan was delegated to Sedgwick, and independent third-party Claims Administrator.

## III.   LEGAL STANDARD -- SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Further, "*Celotex* requires that for issues on which the movant would bear the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact," that is, "that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Id.* at 323. On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby Inc.*, 411 U.S. 242, 255 (1986).

## IV.   ANALYSIS

### A.   Exhaustion

9

The first issue demanding the Court's attention is whether Plaintiff properly exhausted his administrative remedies. "Federal courts have authority to enforce the exhaustion requirement in ERISA actions, 'and [ ] as a matter of sound policy they should usually do so.'" *Dishman v. Unum Life Insurance Co. of America*, 269 F.3d 974, 984 (9th Cir. 2001) (citing *Amato v. Bernard*, 618 F.2d 559, 568 (9th Cir. 1980). There are, however, exceptions to this general rule, and "occasions when a court is obliged to exercise its jurisdiction and is guilty of an abuse of discretion if it does not, the most familiar examples perhaps being when resort to the administrative route is futile or the remedy inadequate." *Id.* (citations omitted).

Here, Defendant argues Plaintiff failed to present his claim to the Claims Administrator, thereby depriving Sedgwick of the opportunity to consider his overpayment claim. Plaintiff responds that because Defendant failed to comply with the notification requirements mandated by the regulations promulgated under ERISA, Plaintiff is "deemed to have exhausted the administrative remedies available under the plan" pursuant to 29 C.F.R. § 2560.503-1(l).[8]

Under section 2560.503-1(g), compliance with ERISA's notification requirements are required for "any adverse benefit determination." *See id*. By the terms of section 2560.503-1(m)(4), an "'adverse benefit determination' means any of the following: a denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit[.]" 29 C.F.R. § 2560.503–1(m)(4). Plaintiff argues the reduction in benefits by $500 per month to recover the overpayment is both a "reduction" in Plaintiff's benefit, and a "failure to provide or make payment . . . in part" within the meaning of 29 C.F.R. § 2560.503–1(m)(4). Defendant argues the March 29, 2010 letter did not constitute an adverse benefit determination because IDSC did not notice a reduction in benefits, but rather initiated the recovery of Plaintiff's overpayment. Defendant's Motion at 19. However, Defendant cites no authority for this

---

[8] The full text of the regulation is as follows: "In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim." 29 C.F.R. § 2560.503–1.

10

1 proposition. By the terms of 29 C.F.R. § 2560.503–1(m)(4), an "adverse benefit determinations"
2 is broader than a denial of benefits and includes the "reduction" in Plaintiff's monthly benefit
3 payments at issue here. Therefore, IDSC was obliged to comply with the notification
4 requirements of 29 C.F.R. § 2560.503–1.

5 Defendant contends that IDSC complied with the notification requirements because the
6 Overpayment Letter mailed to Plaintiff on March 29, 2010 states: "If you disagree with the
7 overpayment amount or that you have been overpaid LTD benefits by the Plan, you or your
8 authorized representative may submit a written claim for benefits," and provides IDSC's address.
9 AR 721. The Overpayment Letter did not comply with the notification requirements, however,
10 because it did not state a "description of the plan's review procedures and the time limits
11 applicable to such procedures" or include a "statement of the claimant's right to bring a civil
12 action" following an administrative appeal. 29 C.F.R. § 2560.503-1(g)(1)(iv). Nor did the letter
13 contain a "statement that the claimant is entitled to receive, upon request and free of charge, . . .
14 other information relevant to the claim[.]" 29 C.F.R. § 2560.503-1(j)(3).

15 In response to IDSC's deficient notice, Plaintiff's attorney mailed a letter on June 28,
16 2010 demanding notice pursuant to the applicable regulations and stating Plaintiff's intent to
17 request an administrative review. AR 707-10. IDSC never responded to Plaintiff's letter, thereby
18 depriving Plaintiff of his right to his right to an administrative appeal. Therefore, by the terms of
19 29 C.F.R. § 2560.503-1(l), Plaintiff is "deemed to have exhausted" his administrative remedies.
20 *See id.* Accordingly, the Court has jurisdiction over this matter.

21 **B.    Plaintiff's Request for an Injunction under § 1132(a)(3)**

22 Having determined that IDSC's reduction of Plaintiff's benefits constitutes an "adverse
23 benefit determination," the Court now addresses Plaintiff's request for an injunction under §
24 1132(a)(3) ordering IDSC to comply with ERISA's procedural requirements, namely, to provide
25 adequate notice and provide Plaintiff with a "full and fair" administrative appeal. Plaintiff's
26 Motion at 18-21. While the Court agrees that IDSC should have provided adequate notice of its
27 administrative review process, ordering IDSC to provide an administrative appeal after this
28 Court's adjudication of the substantive issues will have no effect on Plaintiff's rights. Nor is there

11

1 any evidence to show that IDSC will continue to fail to adhere to ERISA's notice requirements
2 and appeals procedure. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) ("[p]ast
3 exposure to illegal conduct does not in itself show a present case or controversy regarding
4 injunctive relief ... if unaccompanied by any continuing, present adverse effects.") (internal
5 quotations omitted). Plaintiff's claim for injunctive relief pursuant to § 1132(a)(3) ordering IDSC
6 to comply with ERISA's procedural requirements is therefore DENIED.

### C. Standard of Review

Next, the parties disagree with regard to the appropriate standard of review the Court should apply to Plaintiff's claim arising under § 1132(a)(1)(B). "A denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit Plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the Plan." *Firestone Tire and Rubber Company v. Brunch*, 489 U.S. 101, 115 (1989). Where the administrator has been granted discretionary authority, a denial of benefits is generally reviewed for an abuse of discretion. *Id*. In applying the abuse of discretion standard, courts should take into account any conflict of interest on part of the plan administrator. *Abatie v. Alta Health & Life Ins. Co*., 458 F.3d 955, 965 (9th Cir. 2006). Moreover, when a plan administrator fails to exercise the discretionary authority of which it has been granted, courts are instructed to apply *de novo* review. *Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1106 (9th Cir. 2003) ("Deference to an exercise of discretion requires discretion actually to have been exercised.").

Plaintiff argues a *de novo* standard of review should apply to his claim arising under § 1132(a)(1)(B) for two reasons. First, Plaintiff argues there is no evidence before the court that "unambiguously" shows Sedgwick was granted the discretionary authority to interpret the Disability Plan. The Court rejects this argument. The parties have stipulated that AT&T, the Plan Administrator at all relevant times, has the discretionary authority to interpret the terms of the Disability Plan, including the authority and discretion to resolve inconsistencies or ambiguities. UMF Nos. 3, 5-7. The parties also stipulate that the Plan Administrator is authorized to delegate such authority to a Claims Administrator, and that at all relevant times, Sedgwick has been the

third-party Claims Administrator for the Disability Plan. UMF Nos. 8-9. The Disability Plan grants the Claims Administrator the following authority and discretion:

> The Long Term Disability Claim Review Administration *shall have the power and discretion* to resolve all factual issues presented in a request for review in a reasonable manner, and to *interpret* and adopt reasonable constructions of any provision of the Plan whenever interpretation or construction is needed to resolve any issue presented in a request for review. The Long Term Disability Claim Review Administrator *shall also have the power and discretion* to establish general interpretations, rules, and procedures to guide the Long Term Disability Claim Administrator when approving or denying similar claims under Section 10.

AR 1237; *see also Abatie*, 458 F.3d at 962 (citing *Firestone*, 489 U.S. at 111) ("To assess the applicable standard of review, the starting point is the wording of the plan"). Under Ninth Circuit precedent, the preceding language is sufficient to confer unambiguous discretion on Sedgwick. *See Abatie*, 458 F.3d at 962-64 (Claims Administrator must be granted the power to interpret the plan, as opposed to merely identifying the entity to pay and administer benefits). Furthermore, there is no inherent or structural conflict of interest because the Disability "Plan is funded by AT&T and not Sedgwick, and administered by Sedgwick and not AT&T." *Day v. AT&T Disability Income Plan*, 685 F.3d 848, 853 (9th Cir. 2012) (citing *Abatie*, 458 F.3d at 967).

Plaintiff's second argument for why the Court should apply a *de novo* standard of review is that "even if IDSC did have discretion to interpret the plan terms, it failed to act on its opportunity to do so by failing to provide an administrative review process." Plaintiff's Motion at 12 (citing *Jebian*, 349 F.3d at 1104-06). Defendant makes no attempt to respond to this argument. In *Jebian*, the Ninth Circuit held that where a claims administrator failed to approve or deny an applicant's claim for benefits within the timeframe allotted by ERISA's regulations, such that the claim was "deemed denied" by the regulations, the plan administrator had not exercised the discretion which it had been granted, and therefore, no deference was owed to its decision. *Jebian*, 349 F.3d at 1104-06. The *Jebian* court cited the U.S. Supreme Court's explanation in *Firestone* that under the trust principles which guide ERISA's plan administrators vested with discretionary authority, courts shall defer to the plan administrator when the "trustee *exercises* discretionary powers." *Firestone*, 489 U.S. at 111. The Court need not decide this issue,

however, because even under the *de novo* standard, the Court finds that Defendant's interpretation of the relevant plan provisions prevails.

### D. Evidence Before the Court

The Court next addresses the question of what evidence may properly be considered. Courts are generally limited to the administrative record when applying the abuse of discretion standard. *Abatie*, 458 F.3d at 970. However, "if the administrator did not provide a full and fair hearing, as required by ERISA, 29 U.S.C. § 1133(2), the court must be in a position to assess the effect of that failure and, before it can do so, must permit the participant to present additional evidence." *Id.* at 973. "Even when procedural irregularities are smaller . . . and abuse of discretion review applies, the court may take additional evidence when the irregularities have prevented full development of the administrative record." *Id.*

Here, Plaintiff filed a Declaration of Juan Huerta in Support of Plaintiff's Motion for Judgment ("Huerta Declaration"). Dkt. 51. Defendant filed a Motion to Strike the Huerta Declaration on the basis that it is not part of the administrative record. Dkt. 57. Defendant also objects to the Huerta Declaration on grounds that it is more prejudicial than probative, as it contains information to garner sympathy for Plaintiff. *Id.* The Court does not rely on the Huerta Declaration. Accordingly, the Court need not decide this issue.

In turn, Plaintiff challenges the Hagestad and Keenley Declarations because they are not in the administrative record and Defendant failed to disclose these witnesses in the initial disclosures, thereby inducing Plaintiff's attorney to agree to informal discovery and waive his opportunity to depose Hagestad and Keenely. Plaintiff's Motion at 4-5. Although this Court recently held that Rule 26(a)'s initial disclosure requirements may apply in cases where the existence of a conflict of interest is at issue, *see Peterson v. AT & T Umbrella Ben. Plan No. 1*, No. 10-03097, 2011 WL 5882877, at *5 (N.D. Cal. Nov. 23, 2011), the Court does not rely on the Hagestad or Adams Declarations. Accordingly, the Court need not decide this issue.

The Court only considers one item of evidence which is outside the Administrative Record and to which Defendant does not object. Through the exchange of informal discovery, Defendant gave to Plaintiff a document entitled AT&T Integrated Service Center Long Term Disability Step

Process ("Step Process"). *See* Plaintiff's Opposition, Ex. 1. The Step Process was filed under seal due to Defendant's contention that the documented contained material which was "Highly Confidential." The Court finds that the contents of the Step Process do not meet the "compelling reasons" test articulated in *Kamakana v. City and County of Honolulu*, 447 F.3d 1172 (9th Cir. 2006). Therefore, the contents of the Step Process which are discussed within this Order will not be under seal.

### E. IDSC's Compliance with Subsection 10.3.2(c) of the Disability Plan

The main issue before the Court is whether IDSC abused its discretion when it interpreted the Disability Plan as providing a means to recover the overpayment without providing notice at the time it calculated the overpayment. The parties do not dispute that IDSC was authorized to recover an overpayment as a result of retroactive SSDI benefits pursuant to the terms of the Disability Plan. The language in the Disability Plan unambiguously authorizes the Claims Administrator, under normal circumstances, to reduce a participant's monthly LTD benefit in order to recover an overpayment resulting from retroactive SSDI benefits. In this case, however, the Court is not presented with normal circumstances.

Here, there is ample evidence that IDSC failed to follow its own internal guidelines by notifying Plaintiff of the overpayment over one year after it was calculated. Pursuant to IDSC's Step Process, Mr. Bingle was supposed to mail Plaintiff an overpayment letter within one business day of receiving approval from his supervisor on March 2, 2009. *See* Pl. Opp., Ex. 1, DEF 3. If Mr. Bingle had followed these instructions, Plaintiff would have been notified of his responsibility to refund IDSC shortly after receiving his retroactive SSDI award.

However, IDSC's failure to follow its own Step Process does not control the outcome of this case. The Step Process is not a binding plan document, but rather a best practice guideline for IDSC employees. Although Plaintiff argues that the Step Process is evidence of the Claims Administrator's interpretation of the Disability Plan, the Court rejects this argument because there are several protocols in the Step Process which are not reflected in the Disability Plan. The issue in this case is governed by the Disability Plan itself. Section 10.3.2 of the Disability Plan provides various "conditions" for denying claims. Within section 10.3.2 are three subsections

15

which address instances in which the Claims Administrator does necessarily "deny" a claim, but rather terminates or reduces benefits for a variety of specified reasons. The central dispute in this case turns on the proper interpretation of subsection 10.3.2(c):

> If a payment of a Long Term Disability Benefit is reduced or eliminated in order to permit the Plan to recover an overpayment or advance, then the Long Term Disability Claims Administrator *shall give written notification within ninety days after <u>declaring</u> the overpayment.*

UMF No. 17, AR 1236 (emphasis added). The word choice in subsection 10.3.2(c) make this provision mandatory. *If* LTD benefits will be reduced to recover an overpayment, then the Claims Administrator *shall* give written notification within ninety days after declaring the overpayment. The Court must determine, therefore, *when* IDSC "declar[ed] the overpayment" in this case.

On the one hand, Plaintiff contends IDSC declared the overpayment in February/March 2009 when IDSC originally calculated, reviewed, and noted the overpayment as "completed" in Juris. Plaintiff's Motion at 14. Because IDSC failed to provide written notification to Plaintiff until over one year had passed, Plaintiff asserts IDSC failed to comply with the subsection 10.3.2(c)'s ninety-day notice requirement. *Id*. On the other hand, Defendant argues that IDSC complied with subsection 10.3.2(c) because IDCS "declar[ed] the overpayment" on March 29, 2010 when an IDSC case manager notified Plaintiff that it had calculated the $63,288.11 overpayment.[9] Defendant's Motion at 16-17. Defendant contends that a Claims Administrator declares an overpayment when it makes a formal announcement of the overpayment to the participant. Once that formal announcement is made, pursuant to subsection 10.3.2(c), the Claims Administrator has ninety days to provide written notification that it will seek to collect the overpayment by reducing monthly LTD benefit payments. For the reasons stated below, the Court agrees with Defendant's interpretation.

---

[9] The Court did not rely on the Merriam-Webster's Dictionary definition of the word "declare," and thus denies Defendant's request for judicial notice as moot. *See* Defendant's Reply at 7 fn. 5.

16

Plaintiff's interpretation of the words "declaring the overpayment" would have the Court hold that IDSC declared the overpayment when it was internally processed, even though IDSC took no further steps to make the overpayment known to Plaintiff at the time. The plain meaning of the word "declare," however, is contrary to Plaintiff's interpretation. A "declaration" generally refers to something more than an internal process or calculation, and usually denotes some sort of announcement to persons who do not already possess the information.

If the drafters of the Disability Plan had intended the words "declaring the overpayment" to refer to the Claims Administrator's internal process of calculating the overpayment, or learning of the overpayment, the drafters could have stated so explicitly. Indeed, the drafters did state this explicitly in section 10.3.2's corresponding subsections. For instance, subsection 10.3.2(a) requires the Claims Administrator to provide written notice within ninety days following the date when the Claims Administrator "*has determined*" that a long-term disability has ceased. AR 1236 (emphasis added). Similarly, subsection 10.3.2(b) requires the Claims Administrator to provide written notification within ninety days following the date when it "*learns of*" an event which causes payments to be discontinued." *Id*. (emphasis added). The words "has determined" in subsection 10.3.2(a), and "learns of" in subsection 10.3.2(b), both suggest that notice shall be given in relation to the Claims Administrator's internal processing of the information. However, the language in subsection 10.3.2(c) is different, and instead of using a word to suggest an internal process, the drafters used the word "declaring." The Court cannot ignore this specific word choice.

Plaintiff argues that Defendant's interpretation of "declaring the overpayment" makes no sense because it would render subsection 10.3.2(c) meaningless by making it read as follows: the "Claims Administrator shall give written notification within ninety days after [notification of] the overpayment." *See* Plaintiff's Motion at 15. However, this is not only reasonable interpretation of subsection 10.3.2(c). Reading subsection 10.3.2(c) is its entire context reveals that it only applies when the Claims Administrator seeks to recover an overpayment by way of reducing monthly LTD benefit payments. Thus, subsection 10.3.2(c)'s reference to "written notification" refers to the notification when the Claims Administrator seeks to *collect* the overpayment by

17

reducing monthly LTD benefits. This is distinct from the "declaration" of an overpayment, i.e. the announcement of the *existence* of an overpayment. Properly interpreted, subsection 10.3.2(c) requires notification of the intent to recover an overpayment by reducing or eliminating a benefit within ninety days of the announcement of the overpayment.

Moreover, Defendant's interpretation of subsection 10.3.2(c) is consistent with other provisions in the Disability Plan. "It is the intent of the Plan that a Participant shall not receive duplicate benefits from the Plan and from sources paying Integrated Benefits." AR 1227. If Plaintiff had been receiving SSDI benefits between June 2005 and February 2009, his monthly LTD benefits would have been reduced by the amount of the SSDI award. However, the Disability Plan contemplates the possibility that a participant's SSDI benefits may be delayed and that a participant will receive a retroactive award in the form of a lump sum. Accordingly, the Disability Plan states in section 5.2.2(f) that the Claims Administrator may recover any retroactive SSDI award. AR 1229. By the clear terms of the Disability Plan, Plaintiff was never entitled to keep the retroactive SSDI award. Moreover, Plaintiff has provided no legal authority for the proposition that even if IDSC had failed to comply with subsection 10.3.2(c), he would be entitled to keep the overpayment. For this reason, the Court also denies Plaintiff's request in the alternative for equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

While the Court sympathizes with the fact Plaintiff was prejudiced by IDSC's inadvertent delay, the Court also recognizes that Plaintiff is not entirely without fault. Plaintiff was informed on multiple occasions that he would not receive duplicate benefits and that it was his responsibility to reimburse IDSC for an overpayment occasioned by a retroactive SSDI award.

## V. CONCLUSION

For the reasons explained above, Defendant's Motion for Summary Judgment is GRANTED and Plaintiff's Motion for Judgment is DENIED.

IT IS SO ORDERED.

Dated: October 17, 2012

_____
Joseph C. Spero
United States Magistrate Judge

18